## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PATRICK MATTHEWS**                                        **CIVIL ACTION**

**VERSUS**                                                        **NO. 15-430**

**BURL CAIN, WARDEN**                                  **SECTION: "G"(1)**

### REPORT AND RECOMMENDATION

Patrick Matthews, a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For all of the following reasons, **IT IS RECOMMENDED** that his petition be **GRANTED IN PART AND DENIED IN PART**.

On November 12, 2009, Matthews was convicted in state court of one count of simple burglary (Count 1) and two counts of theft (Counts 2 and 3) under Louisiana law.[1]  On December 16, 2009, he was sentenced to a term of ten years imprisonment on Count 1 and to a term of seven years imprisonment on each Count 2 and Count 3.[2]  On February 12, 2010, he was found to be a fourth offender and was resentenced as such on Count 1 to a term of life imprisonment without benefit of probation, parole, or suspension of sentence and on Count 2 to a term of twenty years imprisonment without benefit of probation, parole, or suspension of sentence; his sentence on Count 3 was unaffected.[3]  On December 22, 2010, the Louisiana First Circuit Court of Appeal

---

[1] State Rec., Vol. 3 of 8, transcript of November 12, 2009, p. 275; State Rec., Vol. 1 of 8, minute entry dated November 12, 2009; State Rec., Vol. 1 of 8, jury verdict forms.

[2] State Rec., Vol. 3 of 8, transcript of December 16, 2009; State Rec., Vol. 1 of 8, minute entry dated December 16, 2009.

[3] State Rec., Vol. 3 of 8, transcript of February 12, 2010; State Rec., Vol. 1 of 8, minute entry dated February 12, 2010.

affirmed his convictions, habitual offender adjudications, and sentences.[4]  The Louisiana Supreme Court then denied his related writ application on December 2, 2011.[5]

After unsuccessfully seeking post-conviction relief in the state courts, Matthews filed the instant federal habeas corpus application.[6]  Former United States Magistrate Judge Sally Shushan issued a report finding that all of Matthews' claims were procedurally barred and, therefore, recommending that the application be dismissed with prejudice on that basis.[7]  Matthews filed objections to that Report and Recommendation, submitting documentation in support of his contention that his claims had been improperly barred by the state courts.[8]  The United States District Judge then rejected the Report and Recommendation, finding that the procedural rules invoked by the state courts were not adequate bases to bar federal review because they were not evenhandedly applied by the state courts.[9]  Thus, the matter was referred to the undersigned for a Report and Recommendation on the merits of Matthews' claims.  After that referral, additional

---

[4] State v. Matthews, No. 2010 KA 1040, 2010 WL 5442011 (La. App. 1st Cir. Dec. 22, 2010); State Rec., Vol. 4 of 8.

[5] State ex rel. Matthews v. State, 76 So.3d 1165 (La. 2011); State Rec., Vol. 4 of 8.

[6] Rec. Doc. 1.

[7] Rec. Doc. 15; Matthews v. Cain, Civ. Action No. 15-430, 2015 WL 13574307 (E.D. La. Aug. 24, 2015).

[8] Rec. Docs. 16-18.  That documentation had not been submitted to Magistrate Judge Shushan.

[9] Rec. Doc. 21; Matthews v. Cain, Civ. Action No. 15-430, 2017 WL 3840854 (E.D. La. Sept. 1, 2017).  The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.*  This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (emphasis added; citations omitted).

briefing was requested concerning Matthews' excessive sentence claim,[10] and the parties' supplemental briefs have been filed into the record.[11]

## I.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On or about April 16, 2009, the defendant and his co-perpetrator, Jason Blackwell, went to the residence of Leonard and Beatrice Sollberger, located on Bayou Liberty Road in Slidell, Louisiana.  The Sollbergers' daughter, Kelsey Sollberger, was home alone at the time.  After knocking on the door and ringing the doorbell, Kelsey opened the door.  The defendant and Blackwell asked her about purchasing a vehicle on the property, and she informed them that it was not for sale.  After Sollberger closed the door, she heard noises outside as the defendant and Blackwell stole a welding machine from the property before leaving.  The welding machine belonged to Jerry Domecq and was being used by his son, Robert Brown, whom the Sollbergers had hired to add an elevator to their home.  Demecq [sic] had purchased the welding machine for seven hundred fifty dollars.  On the same date, the defendant and Blackwell took tools from a tool shed owned by Lester Nunez, Jr., located on Laurent Road in Slidell, Louisiana.
>
> The next morning, on or about April 17, Michelle Parker and her two sons were at their residence in Slidell when the defendant and Blackwell arrived and began ringing the doorbell, knocking on the door, and banging on the front windows of the home.  Parker contacted her husband, Travis Parker, and the police.  The defendant and Blackwell stole a generator from the back yard of the home before leaving the property.  Mr. Parker had purchased the generator for approximately seven hundred fifty to eight hundred dollars.  The victims were recovering and rebuilding after Hurricane Katrina at the time of the offenses.  The victims' property was recovered and returned.[12]

---

[10] Rec. Doc. 23.
[11] Rec. Docs. 32 and 37.
[12] State v. Matthews, No. 2010 KA 1040, 2010 WL 5442011, at *1 (La. App. 1st Cir. Dec. 22, 2010); State Rec., Vol. 4 of 8.

## II.  Matthews' Claims

### A.  Excessive Sentence

Matthews first claims that his enhanced sentence on Count 1, i.e. a term of life imprisonment without benefit of probation, parole, or suspension of sentence, was excessive.  After that claim was first denied by the Louisiana First Circuit Court of Appeal on direct review, the Louisiana Supreme Court treated Matthews' related writ application challenging the Court of Appeal's judgment as one seeking collateral review and denied relief based on the state's procedural rules which prohibit challenges to sentencing issues in post-conviction proceedings.[13] When he thereafter asserted the claims for a second time in his subsequent state post-conviction application, the Louisiana Supreme Court then denied relief on a different procedural basis, holding that Matthews' post-conviction application was untimely filed.[14]

Because Matthews' excessive sentence claim was expressly denied by the Louisiana Supreme Court on procedural grounds on both occasions it was presented to that court, this Court reviews the merits of the claim *de novo,* unconstrained by the deferential standards of review of

---

[13] State *ex rel.* Matthews v. State, 76 So.3d 1165 (La. 2011); State Rec., Vol. 4 of 8.  In denying relief, the Louisiana Supreme Court stated: "Denied.  La. C. Cr. P. art. 930.3; State *ex rel.* Melinie v. State, 93-1380 (La. 1/12/96), 665 So.2d 1172."  As noted in the original Report and Recommendation issued in this matter, article 930.3 and the Melinie decision concern procedural matters applicable only to post-conviction review. Specifically, article 930.3 limits the grounds on which a prisoner may seek post-conviction relief, while the Melinie decision held that article 930.3 does not allow post-conviction challenges to sentencing errors.

[14] State v. Matthews, 158 So.3d 813 (La. 2015); State Rec., Vol. 4 of 8.  In denying relief, the Louisiana Supreme Court stated:  "Denied.  La. C. Cr. P. art. 930.8; State *ex rel.* Glover v. State, 93-2330 (La. 9/5/95), 660 So.2d 1189.  See also State *ex rel.* Hall v. State, 99-0326 (La. 9/24/99), 871 So.2d 1071."  Again, all of those citations concern procedural matters.  Article 930.8 sets forth the limitations period for filing applications for post-conviction relief.  In Glover, the Louisiana Supreme Court held that an appellate court can deny post-conviction relief as untimely under article 930.8, even if the lower court addressed the merits or did not consider timeliness.  In Hall, the Louisiana Supreme Court clarified that a defendant's conviction becomes final under Louisiana law upon his failure to seek timely review from a court of appeal's decision on direct appeal – an indication that the Louisiana Supreme Court had found Matthews' prior writ application to be untimely (which would also explain why that court construed the prior application as one seeking collateral, rather than direct, review).

28 U.S.C. § 2254(d).[15]  See Solis v. Cockrell, 342 F.3d 392, 394 (5th Cir. 2003) ("Both parties agree that the Texas state courts erroneously rejected the petitioner's … claim on procedural grounds ….  We therefore review the petitioner's claim *de novo* rather than under the deferential standards provided in the Antiterrorism and Effective Death Penalty Act (AEDPA)."); see also Powell v. Quarterman, 536 F.3d 325, 343 (5th Cir. 2008) ("When a claim has been fairly presented to the state court, but the state court does not adjudicate the claim on the merits, and the claim is not procedurally defaulted, the deferential AEDPA standards of review do not apply.").[16]

That said, this Court is still constrained in another respect: federal habeas relief may be granted on this claim only if Matthews' sentence is excessive under *federal* law.[17]  That fact

---

[15] That statute provides that the deferential standards of the review apply only with respect to claims adjudicated on the merits by the state courts:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

[16] Respondent concedes that the AEDPA's deferential standards of review do not apply to this Court's adjudication of this claim.  Rec. Doc. 37, pp. 1-2.

[17] In the state courts, Matthews also argued that that he should have been granted a downward departure under *state* law, specifically State v. Dorthey, 623 So.2d 1276 (La. 1993).  That argument strikes the undersigned as a strong one, especially in light of the fact that the Louisiana Fourth Circuit Court of Appeal recently ordered the resentencing under Dorthey of a fourth offender sentenced to life without parole where the most recent offense was nonviolent (simple burglary of a vehicle) and the predicate convictions (simple burglary, possession of heroin, and distribution of cocaine) were of a similar or an even graver nature than those in the instant case.  State v. Johnson, 207 So. 3d 1101 (La. App. 4th Cir. 2016), writ denied, 233 So.3d 616 (La. 2018).  See also State v. Combs, 848 So. 2d 672 (La. App. 4th Cir. 2003) (finding life sentence excessive for nonviolent third offender).   However, a claim that Matthews' sentence is excessive or otherwise inappropriate under state law simply is not cognizable in a federal proceeding.  Federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law.  Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law.  See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips  v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v.

presents Matthews with a formidable challenge.  Because the standard for granting such claims under federal law is so daunting, such claims rarely succeed.  In light of that reality, opinions addressing such claims are often rather perfunctory.  However, because Matthews' sentence is so strikingly harsh given his offenses, the Court must engage in a more thorough analysis in this instance.

A logical starting point in any discussion of excessive sentence claims is Rummel v. Estelle, 445 U.S. 263 (1980).  In 1973, William James Rummel was charged with obtaining $120.75 by false pretenses – a felony which, by itself, was punishable by a sentence of not less than two nor more than 10 years.  However, Rummel was a recidivist, previously having been convicted in 1964 of fraudulent use of a credit card to obtain $80 worth of goods or services and in 1969 of passing a forged check in the amount of $28.36.  As such, he was sentenced to an enhanced term of life imprisonment with the possibility of parole.

The question before the United States Supreme Court was whether Rummel's sentence was so excessive as to violate the Eighth Amendment's prohibition against cruel and unusual punishment.  In considering that issue, the Supreme Court noted that it had "on occasion stated that the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime," but the Court also noted that "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  445 U.S. at 271-72.

With respect to Rummel's sentence, the Court then noted:

---

Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

> [W]e need not decide whether Texas could impose a life sentence upon Rummel
> merely for obtaining $120.75 by false pretenses.  Had Rummel only committed that
> crime, under the law enacted by the Texas Legislature he could have been
> imprisoned for no more than 10 years.  In fact, at the time that he obtained the
> $120.75 by false pretenses, he already had committed and had been imprisoned for
> two other felonies, crimes that Texas and other States felt were serious enough to
> warrant significant terms of imprisonment even in the absence of prior offenses.
> Thus the interest of the State of Texas here is not simply that of making criminal
> the unlawful acquisition of another person's property; it is in addition the interest,
> expressed in all recidivist statutes, in dealing in a harsher manner with those who
> by repeated criminal acts have shown that they are simply incapable of conforming
> to the norms of society as established by its criminal law.

Id. at 276.  In light of that fact, the Supreme Court concluded that Rummel's mandatory habitual

offender sentence of life imprisonment with the possibility of parole did not constitute cruel and

unusual punishment in violation of the United States Constitution.

Three years later, the Supreme Court decided Solem v. Helm, 463 U.S. 277 (1983).  In

Solem, Jerry Helm was convicted of uttering a "no account" check for $100.  Because he was a

habitual offender with six prior felony convictions (three for third-degree burglary, one for

obtaining money under false pretenses, one for grand larceny, and one for third-offense driving

while intoxicated), he was sentenced as a recidivist to an enhanced term of life imprisonment

without the possibility of parole.  In considering that sentence, the Supreme Court stated:

> [W]e hold as a matter of principle that a criminal sentence *must be proportionate*
> to the crime for which the defendant has been convicted.  Reviewing courts, of
> course, should grant substantial deference to the broad authority that legislatures
> necessarily possess in determining the types and limits of punishments for crimes,
> as well as to the discretion that trial courts possess in sentencing convicted
> criminals.  But no penalty is *per se* constitutional. … [A] single day in prison may
> be unconstitutional in some circumstances.

463 U.S. at 290 (emphasis added; footnote omitted).  The Court then explained:

> [A] court's proportionality analysis under the Eighth Amendment should be guided
> by objective criteria, including (i) the gravity of the offense and the harshness of
> the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction;

and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

Id. at 292.

With respect to the first criterion, the Supreme Court noted:

Helm's crime was one of the most passive felonies a person could commit. It involved neither violence nor threat of violence to any person. The $100 face value of Helm's "no account" check was not trivial, but neither was it a large amount. One hundred dollars was less than half the amount South Dakota required for a felonious theft. It is easy to see why such a crime is viewed by society as among the less serious offenses.

Helm, of course, was not charged simply with uttering a "no account" check, but also with being an habitual offender. And a State is justified in punishing a recidivist more severely than it punishes a first offender. *Helm's status, however, cannot be considered in the abstract. His prior offenses, although classified as felonies, were all relatively minor. All were nonviolent and none was a crime against a person.* Indeed, there was no minimum amount in either the burglary or the false pretenses statutes, and the minimum amount covered by the grand larceny statute was fairly small.

Helm's present sentence is life imprisonment *without* possibility of parole. Barring executive clemency, Helm will spend the rest of his life in the state penitentiary. *This sentence is far more severe than the life sentence we considered in Rummel v. Estelle. Rummel was likely to have been eligible for parole within 12 years of his initial confinement, a fact on which the Court relied heavily.* Helm's sentence is the most severe punishment that the State could have imposed on any criminal for any crime. Only capital punishment, a penalty not authorized in South Dakota when Helm was sentenced, exceeds it.

Id. at 296-97 (emphasis added; footnotes and citations omitted).

With respect to the second criterion (i.e. the sentences imposed on other criminals in the same jurisdiction), the Supreme Court then reviewed South Dakota law and noted:

[T]here were a handful of crimes that were necessarily punished by life imprisonment: murder, and, on a second or third offense, treason, first degree manslaughter, first degree arson, and kidnapping. There was a larger group for which life imprisonment was authorized in the discretion of the sentencing judge, including: treason, first degree manslaughter, first degree arson, and kidnapping; attempted murder, placing an explosive device on an aircraft, and first degree rape on a second or third offense; and any felony after three prior offenses. Finally,

there was a large group of very serious offenses for which life imprisonment was not authorized, including a third offense of heroin dealing or aggravated assault.

       Criminals committing any of these offenses ordinarily would be thought more deserving of punishment than one uttering a "no account" check – even when the bad-check writer had already committed six minor felonies.  Moreover, there is no indication in the record that any habitual offender other than Helm has ever been given the maximum sentence on the basis of comparable crimes.  It is more likely that the possibility of life imprisonment under [the statute pursuant to which Helm was sentenced] generally is reserved for criminals such as fourth-time heroin dealers, while habitual bad-check writers receive more lenient treatment.  In any event, Helm has been treated in the same manner as, or more severely than, criminals who have committed far more serious crimes.

Id. at 298-99 (footnote omitted).

       Lastly, with respect to the third criterion (i.e. the sentences imposed for commission of the same crime in other jurisdictions), the Supreme Court noted:

The Court of Appeals found that "Helm could have received a life sentence without parole for his offense in only one other state, Nevada," and we have no reason to doubt this finding.  At the very least, therefore, it is clear that Helm could not have received such a severe sentence in 48 of the 50 States.  But even under Nevada law, a life sentence without possibility of parole is merely authorized in these circumstances. See Nev.Rev.Stat. § 207.010(2) (1981).  We are not advised that any defendant such as Helm, whose prior offenses were so minor, actually has received the maximum penalty in Nevada.  It appears that Helm was treated more severely than he would have been in any other State.

Id. at 299-300 (footnote and citations omitted).

       The Supreme Court then noted that it was unpersuaded by the argument that Helm's case was analogous to Rummel's case:

       The State argues that the present case is essentially the same as Rummel v. Estelle, for the possibility of parole in that case is matched by the possibility of executive clemency here.  The State reasons that the Governor could commute Helm's sentence to a term of years.  We conclude, however, that the South Dakota commutation system is fundamentally different from the parole system that was before us in Rummel.

       As a matter of law, parole and commutation are different concepts, despite some surface similarities.  Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases.

> The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time.  Thus it is possible to predict, at least to some extent, when parole might be granted.  Commutation, on the other hand, is an *ad hoc* exercise of executive clemency.  A Governor may commute a sentence at any time for any reason without reference to any standards.

Id. at 300-01 (citations omitted).  After noting the difficulties in obtaining a commutation under South Dakota law, as well as the stringent parole system in that state still faced by prisoners fortunate enough to receive a commutation, the Court then concluded:

> The possibility of commutation is nothing more than a hope for "an *ad hoc* exercise of clemency."  It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment.  Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.

Id. at 303.

In light of all of the foregoing considerations, the Supreme Court then held that Helm's sentence was "significantly disproportionate to his crime" and "therefore prohibited by the Eighth Amendment."  Id.  In announcing that holding, the Court noted:

> Contrary to the suggestion in the dissent, our conclusion today is not inconsistent with Rummel v. Estelle.  The Rummel Court recognized – as does the dissent – that some sentences of imprisonment are so disproportionate that they violate the Eighth Amendment.  … *Rummel should not be read to foreclose proportionality review of sentences of imprisonment.*  Rummel did reject a proportionality challenge to a *particular* sentence.  *But since the Rummel Court – like the dissent today – offered no standards for determining when an Eighth Amendment violation has occurred, it is controlling only in a similar factual situation.  Here the facts are clearly distinguishable.  Whereas Rummel was eligible for a reasonably early parole, Helm, at age 36, was sentenced to life with no possibility of parole.*

Id. at 303 n.32 (emphasis added; citations omitted).

However, less than a decade later, the Supreme Court retreated from its holding in Solem in Harmelin v. Michigan, 501 U.S. 957 (1991).  In that case, Ronald Allen Harmelin was convicted

of possessing 672 grams of cocaine and sentenced to a mandatory term of life imprisonment without the possibility of parole.  In deciding the case, a majority of the Supreme Court found that Harmelin's sentence did not violate the Eighth Amendment, although they could not agree why.

Two justices, Justice Scalia and Chief Justice Rehnquist, took the position that Solem's proportionality analysis should be entirely disavowed, opining that "Solem was simply wrong; *the Eighth Amendment contains no proportionality guarantee*."  Id. at 965 (emphasis added).  In their view, the proportionality principle was "an aspect of our death penalty jurisprudence, rather than a generalizable aspect of Eighth Amendment law," and should not have been further extended.  Id. at 994.

On the other hand, Justice Kennedy, joined by Justices O'Connor and Souter, took a different tack, stating that the Eighth Amendment *does* encompass a proportionality principle but concluding that Harmelin's sentence simply was not disproportionate.  Importantly, in their opinion, those three justices took the view that Solem "did not announce a rigid three-part test," explaining:

> Consistent with its admonition that "a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate," Solem is best understood as holding that comparative analysis within and between jurisdictions is not always relevant to proportionality review. The Court stated that "it *may* be helpful to compare sentences imposed on other criminals in the same jurisdiction," and that "courts *may* find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions."  It did not mandate such inquiries.
>      A better reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.

Id. at 1004-05 (emphasis in original; citations omitted).

In dissent, Justices White, Blackmun, Stevens, and Marshall issued three separate opinions employing differing analyses. However, all took the position that a general proportionality requirement *is* encompassed within the Eighth Amendment and that Harmelin's sentence was disproportionate.

Shortly thereafter, the United States Fifth Circuit Court of Appeals summarized <u>Harmelin</u> thusly:

> By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in <u>Solem</u>, and five justices rejected it. Thus, this much is clear: disproportionality survives; <u>Solem</u> does not. Only Justice Kennedy's opinion reflects that view. It is to his opinion, therefore, that we turn for direction. *Accordingly, we will initially make a threshold comparison of the gravity of [a prisoner's] offenses against the severity of his sentence. Only if we infer that the sentence is grossly disproportionate to the offense will we then consider the remaining factors of the <u>Solem</u> test and compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.*

<u>McGruder v. Puckett</u>, 954 F.2d 313, 316 (5th Cir. 1992) (emphasis added).

Since <u>Harmelin</u>, the United States Supreme Court has rarely addressed the constitutionality of noncapital sentences for adult offenders,[18] and none of the Court's subsequent decisions have cast doubt on the Fifth Circuit's three-prong approach as set forth in <u>McGruder</u>.[19] Accordingly, this Court will follow that approach.

---

[18] In 2012, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" <u>Miller v. Alabama</u>, 567 U.S. 460, 465 (2012). In 2015, the Supreme Court then held that "<u>Miller</u> announced a substantive rule that is retroactive in cases on collateral review." <u>Montgomery v. Louisiana</u>, 136 S. Ct. 718, 732 (2016). However, because Matthews was an adult at the time of his instant offenses, albeit not for one of his predicate offenses, those cases afford him no basis for relief.

[19] In fact, the United States Supreme Court later similarly observed:

> The controlling opinion in <u>Harmelin</u> explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin

The first inquiry, i.e. whether the sentence in question is grossly disproportionate to the offense, is arguably the most difficult because "the Supreme Court has not established a process for making this threshold judgment, nor any substantive guideposts." Donna H. Lee, <u>Resuscitating Proportionality in Noncapital Criminal Sentencing</u>, 40 Ariz. St. L.J. 527, 529 (2008). Indeed, even the Supreme Court has acknowledged that "the precise contours" of the gross disproportionality principle are "unclear." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73 (2003); <u>see also</u> <u>id</u>. at 72 ("Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality."). As a result, courts have "little concrete guidance, and the temptation simply to conclude there is no gross disproportionality is strong." Lee, *supra*, at 530.

However, it would be inappropriate to yield to that temptation in the instant case. If the first prong of the <u>Harmelin</u> analysis has any meaning whatsoever, and if a sentence of life imprisonment without the possibility of parole for a habitual offender can *ever* be found to be a grossly disproportionate sentence, it is difficult to argue that Matthews' sentence fails to qualify.[20] Granted, Matthews is no saint; he has run afoul of the law on several occasions. However, his felony convictions were all for relatively minor, nonviolent property crimes committed while he

---

by comparing the gravity of the offense and the severity of the sentence. *In the rare case in which this threshold comparison leads to an inference of gross disproportionality the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.*

<u>Graham v. Florida</u>, 560 U.S. 48, 60 (2010) (emphasis added; citation, quotation marks, brackets, and ellipsis omitted). <u>See also</u> Bradley N. Mumford, <u>Make It Mean Something:  The Case for Broader Protection from Cruel and Unusual Punishment Under the Arizona Constitution</u>, 41 Ariz. St. L.J. 453, 458 (2009) ("[T]he key difference between <u>Solem</u> and what <u>Harmelin</u> eventually came to stand for, is that under <u>Solem</u>, courts could use the three-prong test to determine if the punishment was grossly disproportionate to the crime, while under <u>Harmelin</u>, the courts could engage in intra- and inter-jurisdictional comparisons *only after a comparison of the punishment with the crime leads to an inference of gross disproportionality*." (emphasis added)).

[20] Even the respondent does not appear to contest the fact that Matthews' sentence qualifies as disproportionate, "considering that the defendant's prior convictions resulted in probation rather than jail time.  <u>See also</u> Rec. Doc. 32, pg. 14 (petitioner stole items valued at 'less than the price for a pair of terrace end zone season tickets to the New Orleans Saints')."  Rec. Doc. 37, p. 3.

was a drug-addicted young adult and for which he received no prison time.[21]  Despite those

compelling mitigating considerations, he now stands sentenced to a term of life imprisonment

*without* the possibility of parole.  The harshness of such a sentence cannot be overstated.  As the

United States Supreme Court has observed:

> It is true that a death sentence is "unique in its severity and irrevocability," Gregg
> v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion
> of Stewart, Powell, and STEVENS, JJ.); yet life without parole sentences share
> some characteristics with death sentences that are shared by no other sentences.
> The State does not execute the offender sentenced to life without parole, but the
> sentence alters the offender's life by a forfeiture that is irrevocable.  It deprives the
> convict of the most basic liberties without giving hope of restoration, except
> perhaps by executive clemency – the remote possibility of which does not mitigate
> the harshness of the sentence.  Solem, 463 U.S., at 300-301, 103 S.Ct. 3001.  As
> one court observed in overturning a life without parole sentence for a juvenile
> defendant, this sentence "means denial of hope; it means that good behavior and
> character improvement are immaterial; it means that whatever the future might hold
> in store for the mind and spirit of [the convict], he will remain in prison for the rest
> of his days."  Naovarath v. State, 105 Nev. 525, 526, 779 P.2d 944 (1989).

Graham v. Florida, 560 U.S. 48, 69-70 (2010).[22]

---

[21] While there are only scant details in the record, it appears that Matthews' predicate offenses consisted of four counts
of simple burglary committed in 2005 – offenses to which he pleaded guilty and for which he received suspended
sentences and served no jail time.  Nothing in the record reflects any criminal activity occurring from 2006 through
2008.  This short spate of 2005 burglaries, committed when Matthews was 17 and 18 years old, thus formed the sole
predicate offenses which resulted in Matthews being sentenced as a habitual offender to a term of life imprisonment
without the possibility of parole with respect to the two instant convictions for simple burglary, offenses which were
committed in a two-day period in 2009 when he was 21 years old.  In light of these facts, it is difficult to describe
Matthews as a true "serial" or "chronic" offender.  Rather, it would be more accurate to describe him as an episodic
offender, with one episode in 2005 and another in 2009.

[22] Similarly, one scholar has opined:

> At least in jurisdictions without generous early release provisions, life sentences are practically akin
> to "death-in-prison sentences" or necessarily beget "death by incarceration."  A "life term" is a
> cultural artifact, signifying the recipient's penal servitude until the end of his natural life.  In other
> words, the State is thereby proactively and physically condemning the individual to die within prison
> walls.  One author posits a life sentence is merely "a semantically disguised sentence of death."  For
> the foregoing reasons, the availability of a life sentence has been referred to as the "new death
> penalty" or the "other death penalty."
>
>     Alternatively, commentators have contended that life sentences can be *more* punitive than
> capital punishment, while receiving far fewer substantive and procedural protections.  Professor
> Berry reasonably notes how a life sentence may be *experienced* by prisoners as extra brutal:  "A
> death sentence has an end date, which for some may be less traumatic than imprisonment until one

Of course, the mere fact that a sentence is harsh does not mean that it is disproportionate. Nevertheless, the undersigned has no hesitation in finding that a sentence of *life imprisonment without the possibility of parole* for a youthful, drug-addicted offender guilty of nothing more than two clusters of minor, nonviolent property crimes crosses the line from merely harsh to grossly disproportionate. As one scholar has noted: "[T]here is no uglier disproportionality than a man, guilty of a minor crime, banished to a cage for the remainder of his life." Craig S. Lerner, <u>Who's Really Sentenced to Life Without Parole?: Searching for the "Ugly Disproportionalities" in the American Criminal Justice System</u>, 2015 Wis. L. Rev. 789, 793 (2015) (footnote omitted).[23]

Further, it must be remembered that, in large part, it was the fact that the petitioner in <u>Solem</u> was sentenced *without* the possibility of parole which distinguished his case from <u>Rummel</u> and rendered his sentence disproportionate. <u>Solem</u>, 463 U.S. at 296-97. That same distinguishing characteristic exists here. In light of that fact, as well as other considerations which weigh even

---

dies of natural causes. To the extent that living in prison constitutes suffering, life without parole allows for greater suffering, or at least a longer time for suffering." Compared to capital cases, cases resulting in life sentences are procedurally less likely to necessitate individualized attention to the offender's own characteristics, receive careful and extensive review, enjoy lengthy appellate processes, or be reversed.

Melissa Hamilton, <u>Some Facts About Life: The Law, Theory, and Practice of Life Sentences</u>, 20 Lewis & Clark L. Rev. 803, 813-14 (2016) (footnotes omitted).

[23] Although she ultimately found that relief was unavailable, the Court notes that even Louisiana First Circuit Court of Appeal Judge Page McClendon expressed concerns regarding Matthews' life sentence:

I do not believe that the ends of justice are met by a mandatory life sentence for this 22-year-old defendant, who did not invade any homes and whose past criminal history was limited to non-violent crimes. …
        … I am compelled to note that the imposition of a life sentence for this particular defendant forever closes the door of hope, negates any chance of the defendant becoming a contributing member of society, and imposes an undue burden on the taxpayer, who is required to feed, house, and clothe him for life.

<u>State v. Matthews</u>, No. 2010 KA 1040, 2010 WL 5442011, at *4 (La. App. 1st Cir. Dec. 22, 2010) (McClendon, J., concurring); State Rec., Vol. 4 of 8.

more heavily in Matthews' favor compared to the petitioner in <u>Solem</u> (for example, the <u>Solem</u> petitioner had a more extensive criminal history and his crimes were committed at a significantly older age), the Court finds that <u>Solem</u> controls and that Matthews' sentence is grossly disproportionate to his offense. [24]  Accordingly, the Court will proceed to the remaining two prongs of the analysis.

---

[24] It should also be noted that another component of Matthews' argument is that his recidivist sentence of life imprisonment without the possibility of parole was imposed despite the fact that his predicate offenses *had never resulted in a prior period of incarceration*.  For example, in his reply to the state's response in this matter, he argues:

> The central thesis of Petitioner's present attack includes his age at the time of conviction – just 22 – the nature of his instant conviction and prior criminal history – all non-violent, non-drug-related offenses – *and the time he previous spent in Department of Corrections custody for any of his previous convictions before being sentenced to life – zero.  As Louisiana does not employ a graduated approach to sentencing Petitioner was permitted to receive suspended sentences or probation in lieu of incarceration until such time as the trial judge offered to sentence Petitioner, not yet old enough to rent a car, to life in prison.  If habitual offender provisions are designed to punish recidivism it only follows that multiple offenders be given a sufficient "taste" of prison life before the issuance of the ultimate punishment allowed for conviction of anything other than First-Degree Murder:  a life sentence.*

Rec. Doc. 14, p. 6 (emphasis added).

    At first blush, that argument may appear to shift the blame for Matthews' recidivism away from him and onto the very judges who had shown him leniency in the past.  Nonetheless, the argument is not without some basis in the jurisprudence.  In <u>Rummel</u>, even the Supreme Court seemed to suggest that one reason the petitioner's life sentence as a recidivist in that case was not disproportionate was the fact that his prior periods of incarceration had failed to dissuade him from his criminal ways:

> [G]iven Rummel's record, Texas was not required to treat him in the same manner as it might treat him were this his first "petty property offense."  *Having twice imprisoned him for felonies,* Texas was entitled to place upon Rummel the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.

<u>Rummel</u>, 445 U.S. at 284 (emphasis added).  In a subsequent opinion discussing <u>Rummel</u>, the United States Fifth Circuit Court of Appeals appeared to recognize that the Supreme Court had taken note of the importance of the prior periods of incarceration, observing:

> The Court determined that Texas has a right to protect its citizens from incorrigible recidivists.  Although Rummel's crimes each involved a trivial amount, he had shown that he was "simply unable to bring his conduct within the social norms prescribed by the criminal law of the state."  445 U.S. at 283, 100 S.Ct. at 1144, 63 L.Ed.2d at 396.  When sufficient proof, such as three felony convictions *followed by imprisonment*, indicates that a felon will never lead a law-abiding life, the state may remove the felon from society for a long period or permanently without inhibition from the Due Process Clause of the Fourteenth Amendment.  <u>See</u> <u>id.</u>; <u>Spencer v. Texas</u>, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

Under the second prong's intrajurisdictional analysis, a court must "compare the sentences imposed on other criminals in the same jurisdiction. *If more serious crimes are subject to the same penalty*, or to less serious penalties, *that is some indication that the punishment at issue may be excessive.*"  Solem, 463 U.S. at 291 (emphasis added).  At the Court's direction, the parties filed supplemental briefs addressing this prong of this analysis, and they are in agreement in their conclusions.  Based on those supplemental briefs it is clear that Matthews, a young, drug-addicted, nonviolent, sporadic burglar, was impermissibly subjected to the same penalty as individuals convicted of far more serious crimes in Louisiana.

Absent application of the state's habitual offender law, only those offenders who commit the gravest of crimes are eligible for life imprisonment under Louisiana law.  Matthews noted in his supplemental brief:

> In Louisiana, a life sentence is the second-most severe penalty authorized under law after execution by lethal injection.  It has been reserved for only the most serious offenses, five (5) in fact: First-Degree Murder, Second-Degree Murder, First-Degree Rape, Aggravated Kidnapping, and Aggravated Kidnapping of a Child.  Other serious or violent offenses, such as Armed Robbery, Manslaughter, Aggravated Arson, or Human Trafficking all include less-severe terms of years.  Even Louisiana recidivist criminal statutes penalizing repeat offenses such as Driving Under the Influence, Domestic Abuse Battery, Simple Possession of Marijuana, and Prostitution do not elevate term-offenses to mandatory life sentences.[25]

---

Terrebonne v. Blackburn, 646 F.2d 997, 1002 (5th Cir. 1981) (en banc) (emphasis added).  Focusing on such observations, at least one court has taken the position that the *absence* of prior periods of incarceration is a legitimate consideration in determining whether a lengthy recidivist sentence is disproportionate.  Ramirez v. Castro, 365 F.3d 755, 774 (9th Cir. 2004) ("By any account, it was unreasonable for the state court to overlook the fact that Ramirez *had not been incarcerated on successive occasions for his two prior felonies.*  This was an important fact in Rummel, which the Supreme Court expressly recognized." (emphasis added)).

[25] Rec. Doc. 32, p. 10 (footnotes omitted).

The respondent conceded that this summary of Louisiana law was correct, while additionally observing that "treason – a mandatory death penalty offense, R.S. 14:113 – should probably be added to the list."[26]

Of course, many more offenders are eligible for life sentences under Louisiana's habitual offender law. Again, the parties were in agreement as to what Louisiana law provides on that point; however, the respondent's summary is perhaps the more succinct:

> Louisiana's habitual offender law provides for life-without-parole sentences on a "three strikes" basis. At the time of the commission of the offense, the following categories of offenses counted as "strikes":
>
> (1) a crime of violence under R.S. 14:2(13);
>
> (2) a sex offense as defined in R.S. 15:540 et seq. when the victim is under the age of 18 at the time of the commission of the offense;
>
> (3) a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for 10 years or more; or
>
> (4) any other crimes punishable by imprisonment for 12 years or more.
>
> See La. R.S. 15:529.1(A)(3)(b); (A)(4)(b) (providing for life-without-parole sentence if the present conviction and two prior convictions were for "any combination of" the above-listed crimes). In 2017, the Louisiana legislature amended that statute such that the offenses listed in (3) and (4) above no longer count as "strikes." See Acts 2017, No. 282.[27]

Therefore, at the time Matthews was sentenced, Louisiana law punished a wide swath of fourth offenders identically, regardless of the nature of their criminal histories. Accordingly, a fourth offender with a history of nonviolent property crimes, such as Matthews, was treated no

---

[26] Rec. Doc. 37, p. 3.
[27] Id.; accord Rec. Doc. 32, pp. 10-14.

differently than a fourth offender with a history of violent crimes and/or serious sex offenses.[28]

However, the impropriety of equating such disparate offenders was so apparent that the state has

now abandoned that practice.  In fact, as Matthews noted and the respondent did not dispute, **an**

**individual with Matthews' criminal history would not even be eligible for a life sentence as a**

**habitual offender under current Louisiana law**.[29]

The egregiousness of Matthews' sentence is even more apparent on the third prong of the

analysis where the Court must engage in an interjurisdictional comparison.  As noted, Matthews'

underlying crime was simple burglary, and, because he was adjudicated as a fourth offender based

on his prior simple burglary convictions from 2005, he was sentenced to a term of life

imprisonment without the possibility of parole.  Matthews' counsel conducted an extensive review

of the sentencing statutes of the other states of the union and provided a comprehensive chart

showing the sentences criminal defendants with the same history as Matthews would have faced

in those states.[30]  Based on his findings, he concluded:

> Petitioner was sentenced to life in prison on February 12, 2010 after being
> adjudicated a fourth-time felony offender.  Had Petitioner been convicted of the
> same offense, with the same prior convictions, in Alaska, California, Colorado,
> Connecticut, Delaware, Georgia, Indiana, Kansas, Maine, Maryland, Minnesota,
> Mississippi, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Utah, or
> Virginia – all states with maximum enhanced sentences of eight (8) years or less –
> his prison sentence would be complete by now.  Had he been convicted in Florida,
> Illinois, Massachusetts, Missouri, New Jersey, North Dakota, Texas – states with
> maximum enhanced sentences of 10 years – he would be home before the next
> presidential election.  In Alabama, Arkansas, Iowa, Kentucky, Montana, Rhode

---

[28] On this point, an observation is apposite:  Prior to the Sollberger burglary, Matthews knocked on the Sollbergers'
door and rang their doorbell.  Their teenage daughter, Kelsey Sollberger, who was home alone, answered the door.
After Matthews spoke with her regarding whether a car was for sale, he simply left and stole the welding machine.
Yet his resulting habitual offender sentence for merely stealing that single item, life imprisonment without the
possibility of parole, is the same habitual offender sentence he would have received if had he had instead kidnapped,
raped, or murdered her.
[29] Rec. Doc. 32, p. 14.
[30] Id. at pp. 15-28.

> Island, South Dakota, Tennessee, and Wisconsin Petitioner's enhanced sentence could range from 12 to 100 years but would still be restricted to a determinate term of years at the court's discretion.  In California, Colorado, Connecticut, Maine, Maryland, Minnesota, South Carolina, Utah, Virginia, Wyoming he would have received no enhancement at all.  Only in Idaho, Hawaii, Michigan, New York, Oklahoma, Vermont, and Washington would Petitioner have been subjected to a life sentence.  And, since 2017, only in Washington would Petitioner's sentence be mandated.
>
> Petitioner's sentence is practically unique in American jurisprudence:  A non-violent offender with no prior violent felonies and significant mitigating factors whose life sentence was mandated. Only in the Pelican State and the Evergreen State was such an enhanced sentencing possible and, to its credit, Louisiana has now banned the practice.[31]

The respondent did not dispute those findings.[32]

The undersigned therefore finds that an interjurisdictional comparative analysis likewise supports a conclusion that Matthews' sentence is unconstitutionally excessive. It must be noted that this conclusion neither calls into question the general constitutionality of Louisiana's habitual offender law nor impugns the state's decision to employ a harsher recidivist sentencing structure than those employed by the vast majority of its sister states.  Rather, it is simply a recognition that even among the minority of states that vigorously punish recidivism, a sentence of life imprisonment without parole for a young, drug-addicted, nonviolent, sporadic burglar who had never been sentenced to a single day in prison for his prior offenses is such an anomaly as to be unconstitutional.[33]

---

[31] Rec. Doc. 32, pp. 28-29.  That analysis is hardly surprising, given Louisiana's well-known reputation for sentencing severity in the United States.  As one commentator observed:  "Louisiana is a notable contestant on the list of states with the most severe life without parole laws."  Abigail A. McNelis, Comment, Habitually Offending the Constitution: The Cruel and Unusual Consequences of Habitual Offender Laws and Mandatory Minimums, 28 Geo. Mason U. Civ. Rts. L.J. 97, 108 (2017).

[32] Rec. Doc. 37, p. 4.

[33] The Court also notes that there is some authority that the third-prong comparison should look not only to the sentencing provisions of other states but also to those of other countries.  See United States v. Rivera-Ruperto, 852 F.3d 1, 32 (1st Cir. 2017) (Torruella, J., dissenting).  Judge Torruella noted:

Where a court's comparative analysis at the second and third prongs of the Harmelin analysis validates the court's initial finding of gross disproportionality at the first prong, then "the sentence is cruel and unusual."  Graham, 560 U.S. at 60.  Because that is the case here, it is recommended that Matthews be granted federal habeas corpus relief with respect to his excessive sentence claim.

However, for the following reasons, the Court finds that Matthews' remaining claims have no merit and recommends that those claims be denied.

## B.  Ineffective Assistance of Counsel

Matthews next claims that he received ineffective assistance of counsel both at trial and on appeal.  The United States Supreme Court established a two-prong test for evaluating ineffective assistance of counsel claims.  Specifically, a petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan

---

There is also some suggestion that courts may need to look to foreign law in this step of the analysis. In cases involving the second classification of Eighth Amendment challenges – applying categorical restrictions on the death penalty or LWOP [life without parole] – the Supreme Court "has looked beyond our Nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual.... Today we continue that longstanding practice in noting the global consensus against the sentencing practice in question." Graham, 560 U.S. at 80, 130 S.Ct. 2011.  It is unclear whether in the first classification of Eighth Amendment challenges – such as the as-applied challenge before us today – courts should also look to foreign law.  I therefore note that foreign law further supports the proposition that [the defendant's] sentence is out of proportion to his crime, for "LWOP ... scarcely exists elsewhere in the world.  Yet today, the number of defendants sentenced to LWOP by American courts approaches 50,000.... In fact, what separates the American criminal justice system from the rest of the world, and brands it as distinctively harsh, is the number of inmates dispatched to prison for the duration of their lives, without offering a legal mechanism for freedom."  Indeed, Germany, France, and Italy have declared LWOP to be unconstitutional, and other European countries apply it only very rarely.

Id. at 32-33 (footnotes omitted).  Thus, if such international comparisons do in fact have any role in the analysis, the egregiousness of Matthews' sentence is even more striking.

v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

22

To prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.[34]

### 1.  Trial Counsel

### a.  Failure to Object to Improper Impeachment

Matthews first argues that his counsel was ineffective for failing to object to the state's introduction of evidence to impeach Jason Blackwell's trial testimony.  At trial, the state called Blackwell as a witness.  During Blackwell's testimony, he was asked about various crimes he had committed, including the crimes with which Matthews was also charged in this proceeding.  Blackwell testified that he had no memory of another person, including Matthews, being involved in the commission of those crimes,[35] testimony which even Matthews concedes "the State had not anticipated."[36]  Faced with that unanticipated testimony inconsistent with Blackwell's prior statement, the prosecutor then asked Blackwell whether he had ever told the police that Matthews was involved in the crimes.  Blackwell responded, "I don't even really remember much what I told the police."[37]  The prosecutor then played the recorded statement Blackwell had previously given

---

[34] Because this claim was likewise denied by the Louisiana Supreme Court on procedural grounds, this Court again applies a *de novo* standard of review as to the merits of the claim.
[35] See, e.g., State Rec., Vol. 3 of 8, transcript of November 12, 2009, p. 164.
[36] Rec. Doc. 1-1, p. 12.
[37] State Rec., Vol. 3 of 8, transcript of November 12, 2009, p. 168.

to the police in which he identified Matthews as a co-perpetrator of the crimes charged in the instant case.

Matthews now argues that his counsel should have objected to the introduction of the recording. His argument is convoluted; however, he seems to be contending that the recording was inadmissible hearsay evidence. If that is indeed his argument, it has no merit because the evidence did not in fact constitute hearsay.

Louisiana law provides:

A statement is *not hearsay* if:

> (1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

> (a) In a criminal case, *inconsistent* with his testimony, provided that *the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact* and *where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.*

La. Code Evid. art. 801(d)(1) (emphasis added).

Here, there is no question that (1) the prosecutor directed Blackwell to his prior statement and gave him an opportunity to admit that he had implicated Matthews and (2) additional evidence at trial corroborated Matthews' participation in the crimes. Therefore, the only remaining question is whether Blackwell's testimony was "inconsistent" with his prior statement.

It was. Blackwell testified that he had no memory of anyone else being involved in the crimes or of what he had told police. Louisiana law has long provided that a witness's testimony that he does not remember his prior statement is properly subject to impeachment. Sinceno v. Vannoy, Civ. Action No. 16-6895, 2017 WL 3888227, at *15 (E.D. La. July 5, 2017), adopted, 2017 WL 3868951 (E.D. La. Sept. 5, 2017). For example, in 1939, the Louisiana Supreme Court

noted: "It is well settled that a witness who states that he does not remember whether he made certain statements to a person named may yet be impeached by proof that he did make the statements as charged, which he affected not to recall." State v. Taylor, 192 La. 653, 655, 188 So. 731, 731 (1939). That remained the rule even after the state's adoption of the Code of Evidence. As the Louisiana Third Circuit Court of Appeal has explained:

> A witness must fail to distinctly admit having made the statement before evidence of such statement may be used to impeach. The question then becomes whether a witness' inability to recall a statement constitutes a failure to distinctly admit having made it.
>    In State v. Singleton, 454 So.2d 353 (La.App. 4 Cir. 1984), the court held that the failure of a witness to recall previous statements was a failure to distinctly admit making them, and evidence of the statements should have been allowed for impeachment purposes. This theory is not new to Louisiana jurisprudence, State v. Taylor, 192 La. 653, 188 So. 731 (1939), and State v. Johnson, 47 La.Ann. 1225, 17 So. 789 (1895), and it remains under the provisions of La.C.E. Art. 613. The defendant/witness was "given the opportunity to admit the facts" and he "failed distinctly to do so," as required by La.C.E. Art. 613.

State v. Stanfield, 562 So.2d 969, 974 (La. App. 3rd Cir. 1990); accord State v. Dubroc, 755 So.2d 297, 308 (La. App. 3rd Cir. 1999) ("Failure to recall a statement constitutes a failure to distinctly admit having made it.").

For these reasons, Blackwell's prior inconsistent statement was not hearsay and was properly admitted. As a result, any objection to the prior statement would have been patently meritless. Therefore, this ineffective assistance claim clearly fails, because it is obvious that counsel is not ineffective for failing to make a meritless objection. See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective

assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

### b.  Failure to Object to Inflammatory Statements

Matthews next claims that his trial counsel was ineffective for failing to object to the prosecutor's questions and comments concerning the fact that the victims were individuals who sustained losses in Hurricane Katrina.  Matthews argues that "[t]hese remarks were calculated to engender prejudice against Petitioner by provoking a higher degree of sympathy for the alleged victims and attributing an enhanced malevolence to Petitioner."[38]

However, it is clear that "[t]he failure to object generally falls within the ambit of trial strategy."  Sylve v. Cain, Civ. Action No. 14-1180, 2016 WL 4592135, at *5 (E.D. La. Sept. 1, 2016) (Brown, J.) (footnote and quotation marks omitted).  Moreover, strategic choices by counsel are to be afforded a high degree of deference:

> The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight.  Courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.

Id. (quotation marks and footnotes omitted); accord Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. … [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances,

---

[38] Rec. Doc. 1-1, p. 16.

the challenged action might be considered sound trial strategy." (quotation marks omitted)); Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993); Forman v. Cain, Civ. Action No. 07-4200, 2008 WL 1746710, at *7 (E.D. La. Apr. 14, 2008).

Obviously, it is particularly problematic to second-guess a decision to *forgo an objection* because the benefits of such an objection are often limited even if it succeeds. Where, as in this case, an objection challenges the revelation of potentially adverse information, the objectionable information is already known to the jury by the time the objection is made and the objection might only exacerbate the problem by further focusing the jury's attention on the information. Additionally, there is always a danger that jurors will be annoyed by repeated defense objections concerning seemingly trivial matters – or, worse, if they view the objections as an attempt by the defense to keep information hidden from them. With such concerns in mind, counsel can appropriately choose to forgo an objection, especially where, as here, (1) the prosecutor is not misstating the evidence or implicating other specific rights of the accused, such as the right to remain silent, and (2) the jury instructions will ultimately address the potential problem presented by the information (which, as noted below, did in fact happen this case).

In any event, even if counsel's failure to object is deemed to constitute deficient performance, Matthews still must show that he was in fact prejudiced in order to be entitled to relief. Here, he cannot make that showing. While a juror might naturally be inclined to be sympathetic toward a victim who sustained losses in Hurricane Katrina, the jury was specifically instructed to put such feelings aside. The trial judge stated:

> Ladies and gentlemen of the jury, it is now my duty to instruct you on the law that applies to your deliberations. It is your duty to follow these instructions in reaching your verdict. Although you are the sole judges of the law and the facts on the question of guilt or innocence, you have the duty to accept and apply the law as

given by the Court.  You must decide the facts from the testimony and other
evidence and apply the law to those facts in reaching your verdict.

    ….

*As jurors, you are not to be influenced by mere sympathy, passion,
prejudice, bias, or public opinion.*  You are expected to reach a just verdict.[39]

Courts have repeatedly noted that jurors are presumed to follow their instructions.  See, e.g., Jones
v. United States, 527 U.S. 373, 394 (1999); United States v. Ornelas-Rodriguez, 12 F.3d 1339,
1349 (5th Cir. 1994).  A petitioner's mere speculation that jurors might have disregarded their
instructions and been swayed by their emotions is insufficient to establish prejudice under
Strickland.  See, e.g., Torres v. McNeil, No. 3:08cv396, 2010 WL 5849880, at *17 (N.D. Fla. Nov.
3, 2010), adopted, 2011 WL 674890 (N.D. Fla. Feb. 16, 2011).  Therefore, this claim should be
denied.

### c.  Failure to Effectively Advocate for a Downward Departure at Sentencing

As already discussed at length herein, Matthews received an enhanced sentence as a fourth
offender.  He does not dispute that he was in fact a fourth offender subject to a mandatory sentence
of life imprisonment under the Louisiana habitual offender statute in effect at that time.  However,
he correctly notes that, under Louisiana law, a trial judge "has the option, indeed the duty, to reduce
[a mandatory] sentence" if he or she finds that the mandatory sentence "makes no measurable
contribution to acceptable goals of punishment or that the sentence amounted to nothing more than
the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of
the crime."   State v. Dorthey, 623 So.2d 1276, 1280 (La. 1993) (quotation marks omitted).
Matthews therefore argues that his counsel was ineffective for failing to effectively advocate for a
downward departure under Dorthey.  Specifically, he argues:  "[C]ounsel sat mute.  He did not

---

[39] State Rec., Vol. 3 of 8, transcript of November 12, 2009, pp. 252-55 (emphasis added).

present mitigating witnesses, testimony, or allocution; he did not even question that State's expert witness at sentencing."[40]   However, in his reply to the state's response in this matter, Matthews clarified that he was not actually faulting his counsel for failing to present additional evidence but rather for failing to effectively argue for a departure.[41]

As an initial matter, the Court notes that Matthews' representation that counsel "sat mute" is false.  The record reflects that counsel did in fact request a downward departure.  After citing appropriate state jurisprudence, he argued:

> Considering the, that this was all crimes involving property, burglarizations of property.  There was no physical violence between one person and another.
> Also, the fact that my client has a significant drug addiction to drugs, heroin, and has never been afforded an opportunity by the Court to receive drug treatment or counsel of any kind.
> And I would also like to point to Court, as we talked about before, State v. Hayes, 739 So. 2d 301, the Court found theft over 500 on third offense, that life was unconstitutionally excessive.  Also State v. Taylor and I didn't get the complete site [sic] on that, 930 So. 2d.  And I would also like to move the Court to reconsider sentence on Count One, and also Count Two, as being unconstitutionally excessive.[42]

Moreover, the record further reflects that the sentencing judge fully considered Matthews' circumstances and found that they simply did not warrant a downward departure under Dorthey,[43] and the Louisiana First Circuit Court of Appeal thereafter agreed, affirming the enhanced sentence.[44]

In light of the foregoing, it is abundantly clear that the state courts did in fact consider the circumstances Matthews has faulted counsel for failing to explicitly bring to their attention – and

---

[40] Rec. Doc. 1-1, p. 22.
[41] See Rec. Doc. 14, pp. 8-9.
[42] State Rec., Vol. 3 of 8, transcript of February 12, 2010, pp. 12-13.
[43] Id. at p. 13.
[44] State v. Matthews, No. 2010 KA 1040, 2010 WL 5442011, at *2-4 (La. App. 1st Cir. Dec. 22, 2010); State Rec., Vol. 4 of 8.

they found that those circumstances did *not* warrant a downward departure under <u>Dorthey</u>. Therefore, even if counsel could be considered to have performed deficiently in this respect, Matthews cannot show that he was prejudiced.  In light of the state courts' emphatic rejection of the argument that a downward departure was warranted under <u>Dorthey</u>, there is simply no reasonable probability that Matthews would have received a lesser sentence even if his counsel had advocated more strenuously for a downward departure.  Accordingly, this claim should be denied.

### 2.  Appellate Counsel

On appeal, appellate counsel asserted a single claim:  Matthews' life sentence was excessive.  Matthews now argues that appellate counsel was ineffective for failing to raise other "salient issues."[45]

It is clear that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  <u>West v. Johnson</u>, 92 F.3d 1385, 1396 (5th Cir. 1996).  Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellate counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."  <u>Id</u>. at 753.  Rather, the applicable test to be applied in assessing such a claim is instead whether the issue ignored by appellate counsel

---

[45] Rec. Doc. 1-1, p. 24.

was "clearly stronger" than the issues actually presented on appeal.  See, e.g., Diaz v. Quarterman, 228 Fed. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).

Here, Matthews argues that appellate counsel should have challenged "the trial court's denial of Petitioner's Motion to Suppress; the denial of counsel's request to back-strike juror no. 179, Christine Moorman, who conceded mid-trial to knowing a state-witness; the prosecution[']s repeated references to Hurricane Katrina; the use of Jason Blackwell's audio statement as substantive evidence of Petitioner's guilt; the use of hearsay evidence to establish Michelle Parker's out-of-court 'identification' of Petitioner; the sufficiency of the evidence; or even trial counsel's defective performance."[46]  However, for the following reasons, Matthews has not met his burden to show that any of those suggested claims are "clearly stronger" than the issue actually presented on appeal and, therefore, his ineffective assistance of appellate counsel claim necessarily fails.

Only two of those proposed issues are even discussed in Matthews' federal application, namely the introduction of Blackwell's recorded statement and the prosecutor's references to Hurricane Katrina – and those two issues were clearly meritless.

As to the issue concerning Blackwell's recorded statement, the introduction of that statement was proper for the reasons this Court explained in detail earlier in this opinion. Therefore, no further discussion of that issue is necessary.

As to the issue of the prosecutor's references to Hurricane Katrina, an appellate claim based on those references would have failed for two reasons.

---

[46] Rec. Doc. 1-1, p. 24.

First, as Matthews noted when asserting his foregoing ineffective assistance of trial counsel claim, trial counsel did not object to the prosecutor's references to Hurricane Katrina.  Under Louisiana law, the lack of a contemporaneous objection normally waives appellate review of a purported error.  La. Code Crim. P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); see also State v. Workman, 170 So.3d 279, 294 (La. App. 5th Cir. 2015) ("The contemporaneous objection rule provides that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of its occurrence.  This rule applies to claims of prosecutorial misconduct." (citation omitted)).

Second, in any event, under both federal and Louisiana law, prosecutorial misconduct will warrant relief only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); accord State v. Murphy, 206 So. 3d 219, 231 (La. App. 1st Cir. 2016); see also State v. Greenberry, 154 So.3d 700, 710 (La. App. 5th Cir. 2014) ("Prosecutorial misconduct must be so pronounced and persistent that it casts serious doubts upon the correctness of the jury's verdict.  The reviewing court should accord credit to the good sense and fair-mindedness of the jury that heard the evidence." (citation, quotation marks, and brackets omitted)).  Therefore, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982); accord State v. Tassin, 129 So.3d 1235, 1249 (La. App. 5th Cir. 2013).

In assessing the impact of the prosecutorial misconduct, a court looks to such factors as whether the prosecutor's comments manipulated the evidence, misstated the evidence, or implicated other specific rights of the accused (such as the right to remain silent), whether the jury

instructions addressed the issue, and whether there was substantial evidence to support the verdict. See Darden v. Wainwright, 477 U.S. 168, 182 (1986). None of these factors supports Matthews' proposed prosecutorial misconduct claim. The prosecutor's questions and comments about Hurricane Katrina in no way manipulated the evidence, misstated the evidence, or implicated another specific constitutional right. Further, the jurors were specifically instructed that they were to make their decision based on the evidence and not to be influenced by sympathy, passion or prejudice.[47] And, most importantly, the verdict was supported by overwhelming evidence, including eyewitness identification. Therefore, there is no reasonable basis for concluding that the questions and statements about Hurricane Katrina, even if improper, rendered the trial fundamentally unfair. Accordingly, even if a claim of prosecutorial misconduct had been asserted on appeal, it would have been meritless.

As to the remaining claims Matthews suggests appellate counsel could have asserted, he does nothing but merely list the claims without explanation, legal support, or references to the record. A petitioner obviously fails to meet his burden of proof where, as here, he offers nothing other than his conclusory contention that the proposed claims were stronger than the claim actually asserted. See, e.g., United States v. Redd, 619 Fed. App'x 333, 337 (5th Cir. 2015) ("Redd's conclusory contentions that the proposed sentencing claims were stronger than the appellate issues presented by [counsel] and that such claims would likely have succeeded if raised are insufficient to support a constitutional claims [sic] of ineffective assistance.").

For all of these reasons, Matthews has utterly failed to meet his burden to prove that *any* of the proposed claims were "clearly stronger" than the claim asserted by appellate counsel or that

---

[47] State Rec., Vol. 3 of 8, transcript of November 12, 2009, pp. 252-55.

there is a reasonable probability that the appellate court would have vacated or reversed the trial court judgment if only the proposed claims had been asserted.  Accordingly, Matthews' claim that his appellate counsel was ineffective should be denied.

### C.  Prosecutorial Misconduct

Lastly, Matthews argues that the prosecution engaged in misconduct by introducing Blackwell's recorded statement and making references to Hurricane Katrina.  For the reasons already fully explained herein, the prosecutor's introduction of the recorded statement was proper and his references to Hurricane Katrina, even if improper, were not so egregious as to violate Matthews' right to due process.  Therefore, this prosecutorial misconduct claim is meritless and should be denied.

### RECOMMENDATION

It is therefore **RECOMMENDED** that Patrick Matthews' federal application for habeas corpus relief be **GRANTED IN PART AND DENIED IN PART**.

It is **FURTHER RECOMMENDED** that Matthews' excessive sentence claim be **GRANTED** and that it be **ORDERED** that he be released from confinement unless the state court resentences him to a constitutional sentence in accordance with this opinion within one hundred twenty (120) days.

It is **FURTHER RECOMMENDED** that Matthews' federal application be **DENIED** in all other respects.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this thirteenth day of August, 2018.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**